UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| **RITZEN GROUP, INC.,** ) <br> ) <br> **Appellant,** ) <br> ) <br> **v.** ) <br> ) <br> **JACKSON MASONRY, LLC,** ) <br> ) <br> **Appellee.** ) | **Case No. 3:17-cv-00806** <br> **Judge Aleta A. Trauger** |
| **RITZEN GROUP, INC.,** ) <br> ) <br> **Appellant,** ) <br> ) <br> **v.** ) <br> ) <br> **JACKSON MASONRY, LLC,** ) <br> ) <br> **Appellee.** ) | **Case No. 3:17-cv-00807** <br> **Judge Aleta A. Trauger** |

## MEMORANDUM

Before the court are two appeals filed by Ritzen Group, Inc. ("Ritzen") from orders in the bankruptcy proceedings of Jackson Masonry, LLC ("Jackson Masonry") (Bankr. Case No. 3:16-bk-02065). Ritzen's first Notice of Appeal relates to a ruling made following a June 14, 2016 hearing, in which Ritzen sought relief from the automatic stay. (Case No. 3:17-cv-00806 ("*Ritzen I*"), Docket No. 1.) Ritzen has filed an Appellant's Brief (*Ritzen I*, Docket No. 11), to which Jackson Masonry has filed an Appellee's Brief in response (*Ritzen I*, Docket No. 15), and Ritzen has filed a Reply Brief (*Ritzen I*, Docket No. 17). Ritzen's second Notice of Appeal relates to the bankruptcy court's later disposition of two consolidated adversary proceedings between Ritzen

and Jackson Masonry. (Case No. 3:17-cv-00807 ("*Ritzen II*"), Docket No. 1.) Ritzen has filed an Appellant's Brief (*Ritzen II*, Docket No. 11), to which Jackson Masonry has filed an Appellee's Brief in response (*Ritzen II*, Docket No. 20), and Ritzen has filed a Reply Brief (*Ritzen II*, Docket No. 23). For the reasons stated herein, Ritzen's first appeal will be dismissed as untimely, and the Bankruptcy Court's judgment in the second appeal will be affirmed.

## I. BACKGROUND AND PROCEDURAL HISTORY

### A. Initial Dispute and Chancery Court Action

In 2013, Jackson Masonry and Ritzen entered into a contract for Ritzen to purchase a piece of Jackson Masonry's Nashville real property for $1.55 million. (*Ritzen II*, Docket No. 5 at 2680–90 ("Contract"), at 1–10.) The contract provided that "[t]he consummation of the transaction contemplated by this Agreement ('Closing') shall take place on a mutually agreeable day and time," as calculated within a framework set forth in the contract. (*Id.* at 2.) Although the parties have disputed the calculation of some aspects of the timeline of obligations under the contract, they agree that the parties eventually faced a closing date of December 15, 2014, after which the sale could not be completed without an extension. The contract imposed particular obligations for the parties to perform "at Closing," including Jackson Masonry's providing Ritzen with a number of documents related to the property. (*Id.* at 2–3.)

The sale did not go through, and each party blames the other. Jackson Masonry suggests that Ritzen was unable to finalize its financing for the purchase in time and that December 15, 2014 therefore came and went with no financing in place and no payment conveyed. (*Ritzen II*, Docket No. 20 at 6.) Ritzen disputes that account and argues that it did have a financing deal in place with Amber Lane Development, LLC ("Amber Lane"), which was prepared to provide the funds once Ritzen and Jackson Masonry were otherwise ready to close. Ritzen claims, instead,

that the deal fell apart because Jackson Masonry failed to act in good faith in providing the required documentation. Specifically, Ritzen argues that Jackson Masonry unreasonably and improperly withheld key documents until the eve of the final closing date and then provided copies that contained errors, omissions, and irregularities that stood in the way of completing the sale. (*Ritzen II*, Docket No. 11 at 10.) On December 23, 2014, Ritzen sued Jackson Masonry in Davidson County Chancery Court for breach of contract. (*Ritzen I*, Docket No. 12-1 at 43.)

Discovery in the Chancery Court case was contentious. On February 11, 2016, the Chancery Court entered an order for sanctions against Jackson Masonry, concluding that the company had "failed to provide full and candid responses" to Ritzen's discovery requests. (*Id.* at 52.) Specifically, the court ordered Jackson Masonry to pay Ritzen attorney's fees related to the discovery dispute, granted Ritzen supplemental discovery, and granted Ritzen the opportunity to supplement its previously filed motion for summary judgment. (*Id.* at 53.) Although an April 4, 2016 trial date was rapidly approaching, the discovery disputes continued, and another such hearing was scheduled for March 24, 2016. Ritzen suggests that Jackson Masonry was likely to face further sanctions in the wake of that hearing. Instead, minutes before the scheduled start of the hearing, Jackson Masonry filed for Chapter 11 bankruptcy, triggering an automatic stay of pending litigation. (*Compare id.* at 4 (showing 8:43 electronic filing stamp on bankruptcy petition) *with id.* at 46 (noting 9:00 AM motion hearing on Chancery Court docket)).

**B. Ritzen's April 14, 2016 Motion**

On April 14, 2016, Ritzen filed a motion in the Bankruptcy Court styled "Ritzen Group Inc.'s Motion to Modify or Lift the Automatic Stay." (*Ritzen I*, Docket No. 6 at 30–53 ("Stay Motion"), at 1–24.) Because the precise scope of the relief requested in that motion is contested, *see infra*, the court will describe the motion's contents and structure in greater detail than would

typically be necessary, with a particular eye to the degree to which Ritzen's motion can be characterized as having raised, and the Bankruptcy Court can be characterized as having considered, the issue of dismissing the Chapter 11 petition on the basis of bad faith filing.

The motion's opening paragraph characterizes Ritzen's request for relief as Ritzen's "mov[ing] the Court to modify or lift the automatic stay in [Jackson Masonry's] bankruptcy related to pending state court litigation." (*Id.* at 1.) Neither the motion's title nor the introductory paragraph suggests that Ritzen is seeking any relief other than a lift or modification of the stay.

After a summary of its contents, the motion proceeds to a section under the header "Business, Property, and Litigation Facts." (*Id.* at 4.) For the most part, this section presents a straightforward recitation of the facts and procedural history leading up to the motion. (*Id.* at 4–12.) The final paragraph of the section, however, reads as follows: "This Court should lift the stay to allow the state court to adjudicate these important evidentiary issues and to allow trial to proceed. *In addition, the Court should dismiss the bankruptcy as a bad faith filing.*" (*Id.* at 12 (emphasis added).)

The motion's eventual "Argument" section does not include any arguments specifically devoted to dismissal. Rather, Ritzen's argument is presented under two subheadings: "I. The Court Should Grant Relief From Stay for Judicial Economy"; and "II. The Court Should Grant Relief From Stay 'For Cause' Under Section 362(d)(1)." (*Id.* at 15, 18.) The second of those sections does discuss a number of cases regarding dismissal, but only after explaining that "there is 'no substantive difference between the cause requirement for dismissal of a petition under Section 1112(b) and the cause requirement for relief from stay under Section 362(d)(1).'" (*Id.* at 18 (quoting *In re Lady Bug Corp.*, 500 B.R. 556, 562 (Bankr. E.D. Tenn. 2013)).) The dismissal

cases, therefore, appear to be presented as persuasive authority on the question of relief from the stay, not in support of any distinct request for dismissal.

Finally, in the motion's "Conclusion" section, Ritzen characterizes the relief requested in the motion as follows:

> For the reasons set forth above, Ritzen Group requests that the Court enter an order granting relief from the automatic stay provisions of 11 U.S.C. § 362, for the provision of Rule 4001(a)(3) to be waived, and grant such other and further relief as this Court deems as just and appropriate.

(*Id.* at 23.)

On June 14, 2016, the Bankruptcy Court held a hearing on the motion. (*See Ritzen I*, Docket No. 1-1.) Following the presentation of proof, the court explicitly addressed the relationship between Ritzen's arguments related to the stay and the potential for an argument in favor of dismissal for bad faith filing. Addressing Ritzen's counsel, Judge Keith Lundin stated:

> You've tried a case to dismiss a Chapter 11 for bad faith filing. That's the case you've tried. Whether you know it or not, that's—and no criticism intended, I'm just telling you that's the issue you put up here. And I understand because I've been here long enough to know that the criteria for relief from a stay sometimes overlaps the motion to dismiss.

(*Ritzen I*, Docket No. 12-2 at 116.) The court, however, stressed that it was considering the motion only as having sought relief from the stay:

> I haven't been asked to dismiss the case. I don't have a motion to dismiss. I haven't tried a motion to dismiss but the very first thing I said to you is your case here today has been more like a motion to dismiss the case than like a relief statement. But, trust me, I don't have a motion to dismiss and I'm not going to dismiss the Bankruptcy case today.

(*Id.* at 118.) The court's ensuing judicial economy analysis was explicitly premised on the assumption that, even if the court granted Ritzen's motion, the bankruptcy proceeding as a whole would continue:

5

> You're going to come right back here [if the stay is lifted and you succeed in state court]. I've got exclusive jurisdiction over the property of the estate. You go to state court, say you get an order for specific performance. The Debtor rejects the contract . . . . How do you stop that?

(*Id.* at 121–22.) The Bankruptcy Court's consideration of the motion, in other words, was based, in part, on issues of judicial economy that assumed that Ritzen was not seeking dismissal. Consistently with that reading, the court later referred to a hypothetical future Ritzen "motion to dismiss the case outright, when or if [Ritzen] files." (*Id.* at 139.) Judge Lundin, who was on the verge of retirement, specifically indicated that any such motion would be decided by his successor at that later date. (*Id.*)

When the court announced its ruling from the bench, it characterized the ruling as follows: "For the following reasons I'm going to deny the request to modify or lift the automatic stay." *Id.* at 142. The court memorialized the decision by written order the next day. The written order makes no mention of any request for dismissal. (*Ritzen I*, Docket No. 1-1.) Ritzen has not identified any later-filed motion to dismiss based on bad faith filing.

### D. Adversary Proceedings

Jackson Masonry construed Ritzen's motion regarding the stay as an informal proof of claim and objected to the allowance of Ritzen's claim. (*Ritzen II*, Docket No. 12-3 at 6.) Each of the parties filed an adversary proceeding against the other, which the Bankruptcy Court consolidated with Jackson Masonry's objection and set for trial. (*Id.* at 408.)

Following a bench trial, the Bankruptcy Court disallowed Ritzen's claim. (*Id.* at 885.) The court noted that, "[c]learing away all of the smoke and mirrors," Ritzen's claim presented a "very straightforward matter . . . boil[ing] down to, under the terms of the Contract, who performed at the Closing of this commercial real estate transaction." (*Id.* at 898.) The court

disregarded, as implausible, Ritzen's argument that the alleged defects in Jackson Masonry's paperwork presented an obstacle to closing or constituted a failure to perform under the contract:

> Documents are adjusted at Closing as a matter of course and this transaction was no exception. With the wealth of experience of the attorneys involved on both sides of this transaction, it is impossible to believe that, with both sides at the Closing table or engaged in meaningful dialogue on the phone or by electronic communication on the day of closing, that the necessary changes could not have been accomplished with minimal effort. Debtor's deficiencies were relatively easy to correct, were not commercially unreasonable and within the scope of what a reasonable person would expect to handle to finalize the deal at closing, and overall simply did not rise to the level of a material breach.

(*Id.* at 898–99.) The court found that "both parties wanted the transaction to close, and acted in good faith toward that end," but that, based on the testimony, "Ritzen was not prepared to tender funds" by the date of closing. (*Id.* at 899.) As a result, "Ritzen was unable to perform its duties under the Contract on December 15, 2014," was in breach, and, consequently, did not have a claim against Jackson Masonry. (*Id.*) The court further ordered that Jackson Masonry was entitled to damages from Ritzen for breach of contract. (*Id.* at 886.) The Bankruptcy Court entered a final judgment against Ritzen on April 17, 2017. (*Ritzen II*, Docket No. 12 at 58–59.)

**E. Ritzen's Appeals**

Ritzen filed two Notices of Appeal on May 5, 2017. (*Ritzen I*, Docket No. 1; *Ritzen II*, Docket No. 1.) The first Notice of Appeal purported to be directed at the Bankruptcy Court's "Stay Relief Order [that] was entered on June 16, 2016 but did not become final until April 17, 2017." (*Ritzen I*, Docket No. 1 at 2.) The second Notice of Appeal was directed at the disallowance of Ritzen's claim and judgment in favor of Jackson Masonry. (*Ritzen II*, Docket No. 1 at 2.) Both appeals are now fully briefed and ripe for decision.

## II. LEGAL STANDARD

The court has jurisdiction over this matter pursuant to the United States Code, which provides that:

> The district courts of the United States shall have jurisdiction to hear appeals . . . from final judgments, orders, and decrees . . . of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title. An appeal under this subsection shall be taken only to the district court for the judicial district in which the bankruptcy judge is serving.

28 U.S.C. § 158(a). In hearing an appeal from a bankruptcy court's order, the district court reviews the bankruptcy court's findings of fact for clear error and the court's conclusions of law *de novo*. *In re Wells*, 561 F.3d 633, 634 (6th Cir. 2009); *In re Rembert*, 141 F.3d 277, 280 (6th Cir. 1998).

## III. ANALYSIS

### A. Modification or Lift of Automatic Stay

Ritzen identifies a number of alleged errors in the analysis underlying the Bankruptcy Court's June 15, 2016 ruling on the motion that Ritzen, at the time, denominated as its "Motion to Modify or Lift the Automatic Stay," but that Ritzen now renames its "Dismissal/Stay Relief Motion." (*Ritzen I*, Docket No. 11 at 12.) Although Jackson Masonry disputes that the Bankruptcy Court committed reversible error, it argues first that this appeal is untimely because a denial of a motion to lift or modify an automatic stay is a final order from which a timely notice of appeal must be filed within fourteen days, pursuant to Fed. R. Bankr. P. 8002(a). Ritzen replies that the court should not consider the Bankruptcy Court's order merely as a denial of a motion for relief from the stay, but as the denial of a "request to dismiss the case, or in the alternative, for relief from the automatic stay." (*Ritzen I*, Docket No. 11 at 2.) As a denial of a

motion to dismiss, Ritzen argues, the Bankruptcy Court's ruling was interlocutory and did not become final until the parties' dispute was resolved on the merits.

The details painstakingly recounted above leave little doubt that Ritzen's motion was, in both its form and the near totality of its content, a simple motion for relief from the automatic stay, not a motion to dismiss. At best, it was a motion to lift or amend the stay that included a passing suggestion, in its facts section, that the court "*should* dismiss the bankruptcy." (*Ritzen I*, Docket No. 7 ¶ 47 (emphasis added).) Moreover, insofar as the motion itself left room for confusion, the Bankruptcy Court explained to the parties, copiously and clearly, that the court was not construing the motion as a motion to dismiss and, if Ritzen sought to pursue dismissal, Ritzen would have to file a fresh motion to that effect. This court has not found, nor has Ritzen identified, any suggestion in the transcript of the relevant hearing that the parties, at the time, were at all confused about what was under consideration and what was not. The Bankruptcy Court's ruling was, unambiguously, a denial of relief from the stay and only a denial of relief from the stay.

Ritzen argues next that, even if the court considers the Bankruptcy Court's ruling a denial of a motion for relief from the automatic stay, the court should not consider that order as having been final for purposes of appeal. As Jackson Masonry points out, however, most courts that have spoken on the issue, including the Sixth Circuit Bankruptcy Appellate Panel ("B.A.P."), have held that a denial of a motion for relief from an automatic stay constitutes a final, appealable order. *See, e.g.*, *In re Schaffrath*, 214 B.R. 153, 154 (B.A.P. 6th Cir. 1997) ("Grants and denials of motions for relief from the automatic stay are final, appealable orders."); *In re Elliot*, 214 B.R. 148, 149 (B.A.P. 6th Cir. 1997) ("Denial of a motion for relief from the automatic stay is a final, appealable order.") (citing *In re Megan-Racine Assocs., Inc.*, 102 F.3d

9

671, 675 (2d Cir. 1996); *Franklin Savs. Ass'n v. Office of Thrift Supervision*, 31 F.3d 1020, 1022 n.3 (10th Cir. 1994); *In re West Electronics*, 852 F.2d 79, 82 (3rd Cir. 1988); *In re Cimarron Investors*, 848 F.2d 974, 975 (9th Cir. 1998)); *In re Curry*, 347 B.R. 596, 597 (B.A.P. 6th Cir. 2006) ("The bankruptcy court's order denying relief from the automatic stay is a final, appealable order."); *In re So. Indus. Banking Corp.*, 70 B.R. 196, 198 (E.D. Tenn. 1986) (noting that orders "granting or denying relief from automatic stays by bankruptcy courts . . . have been held to be 'final' orders reviewable by district courts").

In its Reply, Ritzen concedes that the Sixth Circuit B.A.P. and others have applied a "blanket rule" treating all such orders as final and appealable but argues that this court should, instead, adopt a case-by-case approach, which Ritzen identifies with *In re Atlas IT Export Corp.*, 761 F.3d 177, 184 (1st Cir. 2014). Under the *Atlas IT* approach, an order granting relief from a stay is always final and appealable, but, if the order denies relief, "[e]verything depends on the circumstances . . . : taking into account the particular order's reasoning and effect, an inquiring court must determine . . . whether that edict definitively decided a discrete, fully-developed issue that is not reviewable somewhere else. If yes, the order is final; if no, it is not." *Id.* at 185.

In other words, Ritzen asks this court to go against every other identified case in this circuit and replace a simple, predictable rule with a vague, unpredictable one. The court declines to do so. Such a test would leave parties forever guessing about when they needed to file an appeal, always at the risk of waiting too long and losing their rights or appealing too early and wasting their time. Ritzen presents no convincing reason for the court to depart from the substantial body of caselaw recognizing that an appeal from an order denying relief from a stay can—and therefore should—be filed within fourteen days of when the decision is rendered.

Because Ritzen did not appeal the denial of relief from the automatic stay within fourteen days, that appeal is untimely.

**<u>B. Disallowance of Ritzen's Claim</u>**

Ritzen identifies five issues for appeal regarding the Bankruptcy Court's ultimate disposition of the parties' adversary proceedings, but those five issues can be reduced to three core questions: 1) whether the Bankruptcy Court erred by interpreting the contract as requiring Jackson Masonry to provide the required documentation only at the time of, rather than prior to, closing; 2) whether the Bankruptcy Court erred in concluding that Jackson Masonry did not violate the duty of good faith and fair dealing with regard to the required documentation and the arrangement of the closing; and 3) whether the Bankruptcy Court clearly erred in its factual finding that Ritzen failed to acquire financing for the transaction by the closing date.

        1. Interpretation of the Contractual Language

Ritzen argues, first, that the Bankruptcy Court erred by construing the parties' purchase contract to require that Jackson Masonry provide adequate documents only by the time of closing, rather than at some earlier time. Jackson Masonry responds that the Bankruptcy Court correctly read the contract as requiring tender of adequate documents "at closing" and that Jackson Masonry, therefore, did not breach the contract by providing imperfect documents when there was still time to revise them.

In "resolving disputes concerning contract interpretation, [the court's] task is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contractual language." *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 890 (Tenn.

2002) (quoting *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999)).[1] The central tenet of contract construction is that the intent of the contracting parties at the time of executing the agreement should govern. *Id.* The determination of the parties' intent is generally a question of law, because the words of a written contract are definite and undisputed. *Id.* (citing *Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001); 5 Joseph M. Perillo, Corbin on Contracts § 24.30 (rev. ed. 1998)). The parties' intent is presumed to be that specifically expressed in the body of the contract. "In other words, the object to be attained in construing a contract is to ascertain the meaning and intent of the parties as expressed in the language used and to give effect to such intent if it does not conflict with any rule of law, good morals, or public policy." *Id.* (quoting 17 Am. Jur. 2d Contracts § 245).

If clear and unambiguous, the literal meaning of the language controls the outcome of contract disputes. Ambiguity does not arise "merely because the parties may differ as to interpretations of certain of its provisions." *Johnson v. Johnson*, 37 S.W.3d 892, 896 (Tenn. 2001) (citation omitted). Rather, "a contract is ambiguous only when it is of uncertain meaning and may fairly be understood in more ways than one.' " *Planters Gin*, 78 S.W.3d at 890 (quoting *Empress Health & Beauty Spa, Inc. v. Turner*, 503 S.W.2d 188, 190–91 (Tenn. 1973)).

In this case, the plain language resolves the dispute. The contract unambiguously states that Jackson Masonry had a duty to deliver the relevant documents "[a]t Closing," with "Closing" defined as "[t]he consummation of the transaction contemplated by this Agreement." (Contract at 2.) That transaction, however, was never consummated, and none of Jackson Masonry's conduct was inconsistent with ultimately fulfilling its obligations in time. There is

---

[1] The parties agree that this matter is governed by Tennessee law. (*Ritzen II*, Docket No. 11 at 21; Docket No. 20 at 30.)

simply no language in the contract that forbids, or could even be charitably construed as forbidding, last-second revisions to bring Jackson Masonry's documentation into compliance with its duties as seller.[2]

Ritzen argues next that, even if the contract would seem to require Jackson Masonry to provide the transaction documentation only at the time of closing, such a reading fails to take into account the customs and norms of the commercial real estate business. *See Explosive Specialists, Inc. v. Whaley Consrt. Co.*, No. 03A01-9509-CH-00305, 1996 WL 4040, at *2 (Tenn. Ct. App. Jan. 3, 1996) (noting that it is appropriate to "tak[e] into account the custom and usage of the trade" when construing a contract). In support of its argument, Ritzen cites testimony from an expert whom it presented at trial as well as secondary sources, suggesting that the parties in a commercial real estate transaction should circulate required documents "in advance" or "sufficiently prior to the closing." (*Ritzen II*, Docket No. 11 at 34 (quoting 12 *Tenn. Prac., Legal Forms Real Estate* § 2:25; *Commercial Real Estate Transactions* § 13:11 (3d ed.).) None of those sources, however, suggests that "at closing" has any specialized meaning other than "at closing." Rather, they merely suggest that best practices would have the parties exchange all relevant documents well ahead of time. The fact that exchanging documentation early is a good idea—or even the norm—does not establish that the parties in this case had a meeting of the minds that a failure to do so would be a breach. Indeed, there are many reasons why parties might wish not to commit themselves to an overly aggressive timeline for finalizing

---

[2] Ritzen suggests that Jackson Masonry's continued revision of the title insurance policy ran afoul of section 13(m) of the contract, which makes Ritzen's obligations as the purchaser contingent on there being "no adverse change in the Property or due diligence items reviewed by the Purchaser (including, but not limited to, environmental and title matters) prior to Closing." (Contract at 7.) This general reference to "title matters," however, cannot overcome the contract's more specific language, in section 7(b)(ix), making the title insurance policy due only "at Closing." (*Id.* at 3.) The Bankruptcy Court received testimony at trial that there had been no adverse change in the title and found that that testimony was "well taken." (*Ritzen II*, Docket No. 1-3 at 7.)

paperwork. Ultimately, the court must be guided by the plain language of the agreement itself, not the court's own judgment about the best way to complete a real estate transaction. The contract, as written, did not impose any mandatory calendar for circulating Jackson Masonry's closing documents in advance. The Bankruptcy Court's interpretation of the contractual language, therefore, was not error.

## 2. Duty of Good Faith and Fair Dealing

Closer to capturing the essence of Ritzen's theory of the case is its allegation that Jackson Masonry violated its duty of good faith and fair dealing. It is well-settled in Tennessee that "there is implied in every contract a duty of good faith and fair dealing in its performance and enforcement." *Wallace v. Nat'l Bank of Commerce*, 938 S.W.2d 684, 686 (Tenn. 1996) (quoting *Covington v. Robinson*, 723 S.W.2d 643, 645–46 (Tenn. Ct. App. 1986)). The Tennessee Supreme Court has suggested that one way to look at this duty is by "allowing the qualifying word 'reasonable' and its equivalent 'reasonably' to be read into every contract."[3] *Dick Broad. Co. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 661 (Tenn. 2013) (citing *Pylant v. Spivey*, 174 S.W.3d 143, 152 (Tenn. Ct. App. 2003); *Hathaway v. Hathaway*, 98 S.W.3d 675, 678–79 (Tenn. Ct. App. 2002); *Hurley v. Tenn. Farmers Mut. Ins. Co.*, 922 S.W.2d 887, 892 (Tenn. Ct. App. 1995)).

---

[3] However, the implied duty of good faith and fair dealing "does not extend beyond the agreed upon terms of the contract and the reasonable contractual expectations of the parties." *Wallace*, 938 S.W.2d at 687. "The implied obligation of good faith and fair dealing does not . . . create new contractual rights or obligations, nor can it be used to circumvent or alter the specific terms of the parties' agreement." *Goot v. Metro Gov't of Nashville & Davidson Cty.*, No. M2003–02013, 2005 WL 3031638, at *7 (Tenn. Ct. App. Nov. 9, 2005); *see also Dick Broad.*, 395 S.W.3d at 666; *APAC-Atl., Inc., Harrison Constr. Div. v. State*, No. E2012-01536-COA-R3CV, 2013 WL 5883697, at *9 (Tenn. Ct. App. Oct. 31, 2013); *Barnes & Robinson Co. v. OneSource Facility Servs., Inc.*, 195 S.W.3d 637, 642 (Tenn. Ct. App. 2006).

Jackson Masonry, accordingly, had a duty to act reasonably and in good faith in fulfilling its duties and exercising its rights under the contract. It is certainly conceivable that a party to a real estate sale contract might violate such a duty through its bad-faith, dilatory, and uncooperative behavior related to finalizing of the required documentation. Whether Jackson did so in this case, however, depends on factual determinations that this court reviews only for plain error. The Bankruptcy Court concluded that the "complained-of insufficiencies" in Jackson Masonry's documents "could have been corrected with minor adjustments given the relative simplicity of the documents." (*Ritzen II*, Docket No. 1-3 at 11.) It concluded that Jackson Masonry "acted in good faith and was ready, willing, and able to perform its responsibilities under the Contract on December 15, 2014." (*Id.* at 13.) Ritzen's argument that the Bankruptcy Court erred in those conclusions amounts to little more than suggesting that the court should have put more credence in the testimony of Ritzen's preferred witnesses. Such a claim is insufficient to show clear error.[4] Based on the Bankruptcy Court's findings of fact that were not clearly erroneous, Ritzen did not establish a breach of the duty of good faith and fair dealing.

### *3. Ritzen's Failure to Secure Financing*

Ritzen argues, finally, that the Bankruptcy Court committed clear error in concluding that Ritzen had not secured financing and, therefore, was unable to tender the purchase price by the December 15, 2014 closing date. "A finding of fact is clearly erroneous when[,] although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *In re Burke*, 863 F.3d 521, 528 (6th Cir. 2017) (quoting *In re DSC, Ltd.*, 486 F.3d 940, 944 (6th Cir. 2007)).

---

[4] Nor can Ritzen show plain error based on the theory that Jackson Masonry violated the duty of good faith and fair dealing because of its failure to grant an extension beyond December 15. Ritzen's failure to have funding in place after several months would seem to be the precise type of situation that the deadline was drafted to address.

As evidence that it had funding in place by the closing date, Ritzen first points to a letter of December 15, 2014, from Community First Bank & Trust ("Community First") Vice President Michael Franks, in which Franks offers "confirmation that guaranteed funds of $1,550,000 are on deposit . . . for delivery to [Amber Lane] (or its assigns) for purchase of" the property. (*Ritzen II*, Docket No. 12-5 at 77.) The letter, however, states that release of the funds would be conditioned "upon confirmation of the satisfaction of several conditions related to the closing that must be approved by [Amber Lane] or its assigns." (*Id.*) The Bankruptcy Court's holding did not hinge on the question of whether the funds were "available" in some abstract sense, but on whether the various people and entities necessary to complete the financing transaction reached a timely, final agreement that would have granted Ritzen access to those funds in time. (*Ritzen II*, Docket No. 1-3 at 12–13.)

Ritzen relies next on the testimony of Austin Pennington, the president of Amber Lane and a long-time friend of Ritzen's principal, George Ritzen. Pennington testified that, by December 15th, he believed that all issues between Ritzen and Amber Lane had been resolved and that he was ready to authorize disbursement of the funds, once the final closing documents were ready. (*Ritzen II*, Docket No. 12-3 at 282.) Franks, however, testified that Pennington's sole authorization was insufficient for the funds to be released, and Community Trust could not disburse the funds without authorization from Byrd Cain, Pennington's step-father. (*Ritzen II*, Docket No. 12-5 at 536.) Cain himself did not testify at trial, and, while Franks' testimony established that Cain was aware of the transaction and willing to release the funds if his conditions were met, Franks did not testify to any such final communication indicating that the conditions had been met and the funds should be sent. (*Id.* at 535–39.)

The Bankruptcy Court, moreover, found Pennington's testimony not to be credible:

> Mr. Pennington's testimony did not meet the mark and lacked credibility. . . . Mr. Pennington presented little more than a hypothetical description of what might have been or could have been under circumstances that did not actually exist. His testimony lacked any convincing detail regarding a funding arrangement that could have really closed on December 15, 2014, with a specific identified owner and a concrete method of financing. . . . Taken as a whole, the Court found Mr. Pennington's testimony to lack credibility on the crucial question of Ritzen's ability to close.

(*Ritzen II*, Docket No. 1-3 at 7–8.)

Some of the other witnesses with knowledge of the transaction provided accounts suggesting that financing was not in place. Tim Crenshaw, one of Jackson Masonry's attorneys in the real estate sale, testified that an attorney for Ritzen, Laurence Papel, informed him on December 15, 2014, that Ritzen was still working on securing the funds and that it might require an additional two weeks. (*Id.* at 750.) The deposition testimony of the transaction's closing attorney, Keene Bartley, confirmed Crenshaw's account. (*Id.* at 628.)

While Ritzen points to other witnesses' testimony to refute those witnesses' version of events, that testimony merely confirms that this issue hinges on a relative assessment of the witnesses' credibility.[5] The collected testimony, like the parties' overall theories of the case, offers conflicting accounts of the hectic events leading up to and on December 15, 2014. What the evidence does not offer, however, is any basis for this court to form a definite and firm conviction that the Bankruptcy Court was wrong to ultimately credit Jackson Masonry's account over Ritzen's. The court, accordingly, will not reverse the Bankruptcy Court's judgment for being clearly erroneous on the facts.

---

[5] Ritzen devotes a great deal of attention to the fact that the Bankruptcy Court, in its bench ruling, referred to a portion of Bartley's testimony as "uncontroverted," when, in fact, Papel did offer a contrary account of the same events. It is difficult for this court, reading the Bankruptcy Court's statement in isolation, to discern which detail or details the court was considering "uncontroverted." (*Ritzen II*, Docket No. 1-3 at 10; Docket No 12-3 at 446.) The bench ruling as a whole, however, makes clear that the Bankruptcy Court considered and weighed all of the witnesses' testimony in reaching its ultimate conclusion.

## IV. CONCLUSION

For the foregoing reasons, Ritzen's appeal docketed as Case No. 3-17-cv-00806 will be dismissed as untimely, and the Bankruptcy Court will be affirmed in the appeal docketed as Case No. 3:17-cv-00807.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge